[No. C.D. 2952.    En Banc.    February 16, 1967.]

*In the Matter of the Disciplinary Proceeding Against* JOHN
M. WARNOCK, *an Attorney at Law.**

*Reported in 423 P.2d 929.

*T. M. Royce,* for Board of Governors.

*John M. Warnock,* pro se.

HALE, J.—The strong, compelling nature of the evidence against John M. Warnock, a member of the bar of this court, left the trial committee and the Board of Governors no reasonable alternative but to recommend his disbarment. So clearly was Mr. Warnock in violation of the Canons of Professional Ethics and his oath of attorney that a mere recital of his conduct, even without discussion of the legal precedents pertaining to it, makes this result mandatory.

Pursuant to a formal complaint, supplemental formal complaint and answers thereto, the conduct of John M. Warnock, attorney at law, came on for trial before a hearing panel composed of Erle W. Horswill, a member of the Board of Governors, Efrem Z. Agranoff and Dennis J. Britt, members of the bar of this court.

After trial, the hearing tribunal made formal findings of fact and conclusions declaring Mr. Warnock guilty of numerous violations of the code of ethics and recommended his disbarment, suspension, and a reprimand. On review, the Board of Governors approved and adopted as its own the findings, conclusions and recommendations of the hearing panel, all of which we find amply supported by the evidence and record of proceedings. They establish Mr. Warnock's flagrant breach of ethics on many occasions over a long period of time. Our comments start with the second item of complaint because the Board of Governors dismissed the first item for want of evidence.

Second Item of Complaint. Mr. David P. Bunney owned real estate subject to condemnation for a state freeway, and prior to employing Mr. Warnock had been offered $12,400 on July 22, 1963, in full settlement. Undecided whether to accept, he engaged Mr. Warnock in early October, 1963, to attend a hearing on the order of convenience and necessity in Superior Court for Snohomish County, and to ascertain the date of trial. The retainer was limited to this one pur-

pose and Mr. Bunney paid Mr. Warnock $35 in advance for these professional services. Mr. Warnock failed to attend the hearing October 10, 1963, but Mr. Bunney, the client, was present and learned that trial of his condemnation case would be held in May, 1964.

Mr. Warnock, meanwhile, had notified the attorney general's office that he appeared as counsel of record for Bunney and would accept the state's offer of $12,400. Thereupon, without Mr. Bunney's knowledge, consent or authority, actual or implied, Warnock, about May 15, 1964, picked up a check from the state in the sum of $12,303.79, in full settlement of Mr. Bunney's claim, and 4 days later sent Mr. Bunney a cashier's check for $10,000, retaining about $2,400 for his services.

On receipt of the check, Mr. Bunney made repeated but futile efforts to communicate with Mr. Warnock for an explanation. Even when he obtained appointments, they were never kept by Warnock. Then, October 16, 1964, Mr. Bunney received another cashier's check for $1,200, and a bank money order for $250 from Warnock along with a letter stating that Warnock was retaining only $853.79 for his fee.

Thus, without authority from or explanation to his client—a client who had employed him for the sole purpose of attending a single hearing and which he failed to do— Warnock settled a claim in eminent domain in May, 1964, for $12,303.79, remitted only $10,000 thereof and without explanation retained the remaining $2,303.79 from May, 1964, for nearly 5 months until October, 1964. Warnock then remitted to his client $1,450 and kept the remainder, $853.79, permanently. He performed no services warranting the claimed fee of $853.79, nor any services justifying a fee anywhere close to that amount. His evasion and refusals to see Mr. Bunney and his repeated failure to keep office appointments with him compounded the unethical practices.

For Mr. Warnock's misconduct as described above, the Board of Governors recommended his suspension from practice for one year. We are of the opinion that the mis-

conduct, demonstrating as it did persistent and continuing disregard of professional ethics, starting with a failure to attend the hearing on convenience and necessity on October 10, 1963, continuing on to his unethical retention of an exorbitant fee in October, 1964—nearly one year later—showed so flagrant a disregard for his professional responsibilities as to warrant his disbarment on this, the second item of complaint. Canon of Professional Ethics 11, RCW vol. 0. We find no extenuating circumstances here such as were present in *In re Mitchell,* 189 Wash. 612, 66 P.2d 300 (1937).

Third Item of Complaint. July 22, 1963, Mr. Warnock prepared and filed a divorce complaint in the Superior Court for Snohomish County for Elisa Elliott against her husband, Donald E. Elliott. Her husband appeard by counsel, filed his answer and cross complaint and the cause was set for trial. The court, February 28, 1964, on plaintiff wife's testimony granted her a decree of divorce, awarded her judgment of $675, and approved a property settlement agreement as a part of the decree.

Earlier, January 14, 1964, Mr. Warnock had written to his client that the balance due him for his attorney fee in the divorce action amounted to $144.20. Following entry of the decree and the $675 judgment, counsel for defendant husband, about February 28, 1964, delivered to Mr. Warnock a check in the amount of $675 which Warnock cashed, retaining the money. During the first week of March, his client asked him about the $675 check and Warnock told her that it had not yet cleared the bank.

About 2 weeks later, Mr. Warnock, at his client's request, issued a show cause order against the husband to obtain possession of a television set, and, on April 11, 1964, his action having been successful, Warnock delivered the television set to his client's home. She then asked him for money and he gave her $20.

Three days later, Mrs. Elliott went to Warnock's office to request the money delivered to him on the $675 judgment, and Mr. Warnock said that he had already dictated a letter of transmittal into his Dictaphone, and that his check and

letter would be in the mail shortly. Mrs. Elliott never received the letter or money from Warnock. Between her visit of April 14, 1964, and October 2, 1964, she tried numerous times to telephone Mr. Warnock but had no chance to speak to him, and he never returned her calls.

Only after Warnock had been cited to appear and answer charges before the Bar Association, and hearings had actually begun, did he make any remittance to his client. He thus retained $655 of his client's money on the pretext that he had earned it as his fee. Assuming that he had earned an additional fee for recapturing the television set, the amount retained was so clearly unconscionable in relation to the services performed and in the light of his statement of January 14, 1964, that the amount due him was the $144.20, as to constitute a willful refusal to deliver over money received by him as an attorney for his client. He kept for his own use about $500 of his client's money. The Board recommended disbarment for this misconduct. We agree that the derelictions described in this third item of complaint warrant disbarment.

Supplemental Formal Complaint. The Board of Governors next considered an item set forth in a supplemental complaint concerning clients Mr. and Mrs. Harlow E. Tait. In July, 1962, the Taits engaged Mr. Warnock as their attorney to prosecute an action for damages arising out of Mrs. Tait's slip and fall in a furniture store. The retainer agreement provided that Mr. Warnock would receive one fourth of any amount recovered without court proceedings and one third if the case went to trial.

During settlement negotiations, the Taits and Warnock agreed that Warnock would pay all of Mrs. Tait's medical expenses and adjust his fee, if necessary, so as to be paid in full for his services from the amount obtained in settlement. On January 25, 1963, Mr. Warnock, with the authority of his clients, settled the claim without going to court and received a draft from an insurance company in the amount of $1,750 in full payment. The Taits also turned over to Mr. Warnock another check payable to Providence

Hospital in the sum of $240, thus bringing to $1,990 the amount turned over to Warnock for payment of all medical expenses and his attorney fee.

Mrs. Tait's expenses came to $1,539.10, including $540 for her doctor. Mr. Warnock paid all of the medical bills except that one, retaining from the $1,990 the sum of $974.25. Even with no adjustment whatever, his fee under the retainer agreement came to $437.50, leaving on hand $536.75 belonging to the Taits.

The unpaid doctor made demand upon the Taits, and, following repeated but futile efforts to contact Warnock, they borrowed the money and paid the doctor on December 1, 1964. Later, after the Taits had complained to the Bar Association, Warnock, on December 23, 1964, sent $189.50 to the doctor by check, who, having already been paid by the Taits, forwarded it to them. On depositing the check for payment, it was returned to them for insufficient funds to be finally made good by Warnock about one month later.

■ Thus, for over 2 years, Mr. Warnock, without the consent and against their will, kept money belonging to his clients and made no effort for even partial reimbursement until the Bar Association had intervened. We agree that his conduct in this case deserves disbarment. Taking advantage of the confidence imposed by one's clients, failing promptly to account for moneys coming into the attorney's hands, and commingling it with his own funds violate Canon of Professional Ethics 11, RCW vol. 0.

Fourth Item of Complaint. Mrs. Ruth A. Erickson employed Mr. Warnock to handle the estate of her deceased son. She was appointed administratrix in Snohomish County April 2, 1962. At Mr. Warnock's insistence, Mrs. Erickson advanced $343.10 for funeral expenses. On many occasions, Mrs. Erickson attempted to communicate with Mr. Warnock. He was either unavailable or failed to keep his appointments. From January, 1963, until the time the Board of Governors made its findings and conclusions in June, 1966, no further steps to close the estate were taken by Mr. Warnock, and Mrs. Erickson, who employed him,

had not yet been reimbursed from the estate for her advance of the funeral expenses.

■ The Bar Association recommended a reprimand for Mr. Warnock's professional conduct in violation of Canons of Professional Ethics 21 and 29, RCW vol. 0. We would, instead, suspend him from practice for 30 days on this item of the complaint.

Fifth Item of Complaint. This item of complaint concerns Mr. Warnock's conduct as trustee for and secretary-treasurer of 11 survivorship funds called benevolent associations. In 1946, Mr. Warnock, operating from his law office, assumed management of the following named funds: Cascade Benevolent Association, Everett Benevolent Association, Everett Benevolent Association No. 2, Evergreen Benevolent Association, Islands Benevolent Association, Islands Benevolent Association No. 2, Olympic Benevolent Association, Pacific Benevolent Association, Washington Benevolent Association, and Youth Benevolent Association.

According to the contracts of membership, whenever a member of a fund died, all other members would be assessed $2 each and the total assessments would then be paid over to the deceased's beneficiary, except for 10 per cent retained by the trustee to cover costs of administration. The 10 per cent, that is 20 cents for each $2 contribution, went to Mr. Warnock for his services as trustee, secretary and treasurer. An inherent defect in such a system is that, unless the supply of new members is steadily replenished, the membership becomes constantly older and smaller, and the amount available from surviving members steadily decreases until finally there is no one to contribute to the last surviving member.

Since 1946 until nearly the time of the instant hearing, Mr. Warnock held himself out as either trustee, secretary, treasurer or adviser, and had control of the several funds. During the period from 1946 on, the books and records fell into a chaotic condition. Several times assessments were collected but not remitted to the beneficiaries. In early 1960, blanket notices of assessment were sent out, and some of the members, to preserve their membership, paid assess-

ments as high as $108 for one month. During January and February, 1960, between $5,000 and $10,000 came into Mr. Warnock's trust accounts, and he disbursed considerable amounts therefrom.

Although Mr. Warnock had management and control of these accounts, the records are so hazy that the trial committee was unable to trace moneys in and out of the trust funds, dollar for dollar. But the Board of Governors did find specifically that, in 12 specific instances from 1958 on, assessments had been collected from the members and no payments had been made to the beneficiaries. These beneficiaries had made repeated inquiries of Mr. Warnock as to when and whether they would ever receive their moneys, but he evaded answering them. In innumerable instances, he refused to answer telephone calls from association members or answer their letters of inquiry. Also, in many cases, he made promises of payment which promises were not kept.

Mr. Warnock failed to keep reasonably good books of account as to these trust funds, and between the initial Bar Association hearings on April 1-3, 1965, and the resumed hearing May 1, 1965, he reported to the hearing panel that the records of these funds had, in the interim, mysteriously disappeared from his offices and would not be available for examination.

Altogether, as a trustee, treasurer and controlling manager of the funds, Mr. Warnock commingled trust funds with his own; failed to pay claims which he knew were due and owing; refused to return telephone calls or answer inquiries by members of the funds (which he was duty bound to answer); evaded claimants' reasonable inquiries; made false promises that claims would soon be paid and that checks in payment had already been made out; failed to keep reasonably accurate and reliable records of trust moneys received and disbursed by him; did not properly account to those who had paid into the funds or were entitled to receive payment therefrom; and finally, had no reasonable explanation for the loss or destruction of these valuable trust records. His management of the benevolent

funds showed a clear disregard for the standards of conduct required of a member of the profession. On this item, the Board of Governors recommended disbarment, a recommendation which we find justified.

Further discussion seems unnecessary. John M. Warnock is disbarred and his name shall be stricken from the roll of attorneys.

FINLEY, C. J., HILL, DONWORTH, ROSELLINI, OTT, HUNTER, and HAMILTON, JJ., and LANGENBACH, J. Pro Tem., concur.

*Reported in 423 P.2d 926.