97 Wn.2d 373 (1982)
646 P.2d 122
In the Matter of the Disciplinary Proceeding Against JOHN M. ROSELLINI, an Attorney at Law.
No. C.D. 7768.
The Supreme Court of Washington, En Banc.
May 20, 1982.
Kurt M. Bulmer, for Bar Association.
John N. Rupp, for respondent.
BRACHTENBACH, C.J.
This is an attorney discipline proceeding involving the misuse of trust funds. The hearing panel officer and the Disciplinary Board recommended that attorney John M. Rosellini be disbarred. We concur.
The complaint of the bar association alleged 21 violations of the Discipline Rules for Attorneys and the Code of Professional Responsibility. The hearing panel officer found 14 violations and recommended disbarment. The Board, by a 3-to-2 vote, adopted the hearing panel officer's findings, conclusions, and recommendations. Other members of the Board were either absent or disqualified themselves. The two dissenting members disagreed with the majority only on the issue of the proper sanction. The dissenters believed *375 a 1-year suspension was appropriate.
The respondent admits that he violated the rules governing trust funds. He argues only that he should be suspended, not disbarred.
These charges arise from the following facts. Respondent John Rosellini was employed to probate the estate of Voyena Brandt. On May 31, 1977, he received and placed in his trust account $10,000 which was to be paid to the decedent's two children. Those funds were not disbursed to the Brandt children until September 11, 1978, more than 16 months later.
In the meantime respondent attorney drew the following checks on his trust account for the stated purposes:

 DATE PAYEE AMOUNT PURPOSE
(1) 7-29-77 Seattle 1st Nat Bank $1,968.00 office rent
(2) 8-8-77 Seattle 1st Nat Bank 1,968.00 office rent
(3) 9-20-77 Equitable Savings 1,275.77 residence
 & Loan Ass'n mortgage
 payment
(4) 10-4-77 John M. Rosellini 800.00 personal
 expenses
(5) 10-5-77 Cash 546.03 office
 telephone
(6) 10-17-77 Pacific NW Bell 427.86 office
 telephone
(7) 10-21-77 John M. Rosellini 750.00 personal
 expenses
(8) 10-28-77 Pacific Nat Bank 300.00 residence
 mortgage
 payment
(9) 11-4-77 John M. Rosellini 750.00 personal
 expenses
(10) 11-8-77 Equitable Savings 92.68 residence
 & Loan Ass'n mortgage
 payment
(11) 11-8-77 Cash 225.00 personal
 expenses
*376 (12) 11-8-77 Equitable Savings 636.77 residence
 & Loan Ass'n mortgage
 payment
(13) 11-16-77 John M. Rosellini 700.00 personal
 expenses
(14) 3-23-78 Seattle Seahawks 200.00 personal
 expenses
These withdrawals totaled $10,640.11.

Mr. Brandt made numerous inquiries as to when the $10,000 would be disbursed. Eventually, he filed a complaint with the bar association and an investigation was started. Respondent then disbursed the funds, explaining that he was waiving fees and costs because of unanticipated delays in processing the estate.
The payment to the Brandt heirs was made possible by the following transaction. Three days before disbursing the money respondent received $22,063.94. These funds were from the estate of an Italian national and were delivered to respondent in his capacity as Honorary Vice Consul for Italy. After deducting a fee, respondent put the balance in his consular account. He then transferred $10,000 to his trust account. With these funds he was then able to disburse the amount owed to the Brandt heirs.
On March 21, 1978, after making 13 withdrawals from his trust account for personal use, respondent signed an affidavit required by DRA 13.3, swearing under oath that all clients' funds were kept in his trust account in the manner specified in CPR DR 9-102. That section prohibits the comingling of personal and client funds, and requires that an attorney promptly pay or deliver to the client upon demand all funds in the attorney's possession to which the client is entitled.
Respondent admits that he knew at the time he filed the affidavit that the answers were not true and the trust account was not maintained in the manner specified in CPR DR 9-102 nor were all clients' funds to the extent required by CPR DR 9-102 kept therein. Respondent admits also that at the time he was taking money from the *377 trust account he knew it was wrong, but "it was easy to do."
We are faced with a disciplinary matter where an attorney over a period of 8 months intentionally invaded a trust fund containing his clients' funds.
[1] This court has long disbarred attorneys for such flagrant violation of their professional and fiduciary duties. We have said: "[t]hose few lawyers who mishandle trust funds, who fail to maintain complete records of trust funds and who fail to account and deliver funds as requested are reminded that disbarment is the usual result." In re Deschane, 84 Wn.2d 514, 516-17, 527 P.2d 683 (1974).
Over the years trust account violations have led to disbarment in these cases. In re Gowan, 104 Wash. 166, 176 P. 7 (1918); In re Ward, 104 Wash. 170, 176 P. 2 (1918); In re Martin, 107 Wash. 372, 181 P. 880 (1919); In re Gwynn, 179 Wash. 389, 37 P.2d 1114 (1934); In re Grant, 4 Wn.2d 617, 104 P.2d 602 (1940); In re Moran, 5 Wn.2d 679, 106 P.2d 571 (1940); In re Beakley, 6 Wn.2d 410, 107 P.2d 1097 (1940); In re Scott, 12 Wn.2d 736, 737, 121 P.2d 953 (1942); In re McCoy, 20 Wn.2d 884, 146 P.2d 818 (1944); In re Grimm, 29 Wn.2d 147, 185 P.2d 990 (1947); In re Walsh, 40 Wn.2d 593, 244 P.2d 868 (1952); In re King, 42 Wn.2d 617, 257 P.2d 219 (1953); In re Park, 45 Wn.2d 383, 274 P.2d 1006 (1954); In re Dillard, 48 Wn.2d 376, 293 P.2d 761 (1956); In re Ward, 54 Wn.2d 593, 343 P.2d 872 (1959); In re Carroll, 54 Wn.2d 633, 343 P.2d 1023 (1959); In re Peterson, 56 Wn.2d 187, 351 P.2d 533 (1960); In re Griffin, 58 Wn.2d 149, 361 P.2d 569 (1961); In re Timothy, 58 Wn.2d 153, 361 P.2d 642 (1961); In re McDole, 63 Wn.2d 962, 390 P.2d 9 (1964); In re Marsh, 65 Wn.2d 390, 397 P.2d 828 (1964); In re Chantry, 67 Wn.2d 190, 407 P.2d 160 (1965); In re Moody, 69 Wn.2d 808, 420 P.2d 374 (1966); In re Warnock, 70 Wn.2d 457, 423 P.2d 929 (1967); In re Randall, 72 Wn.2d 676, 435 P.2d 26 (1967); In re Hall, 73 Wn.2d 401, 438 P.2d 874 (1968); In re Anderson, 73 Wn.2d 587, 439 P.2d 981 (1968); In re Johnson, 74 Wn.2d 21, 442 P.2d 948 (1968); In re Stromberg, 75 Wn.2d 955, 452 P.2d 547 (1969); In re Soderquist, 78 Wn.2d 227, 472 P.2d 395 *378 (1970); In re Garvin, 78 Wn.2d 832, 479 P.2d 930 (1971); In re Slater, 78 Wn.2d 958, 481 P.2d 564 (1971); In re Johnson, 81 Wn.2d 46, 499 P.2d 879 (1972); In re Espedal, 82 Wn.2d 834, 514 P.2d 518 (1973); In re England, 82 Wn.2d 121, 508 P.2d 611 (1973); In re Delaney, 83 Wn.2d 415, 518 P.2d 713 (1974); In re Kirchen, 83 Wn.2d 727, 522 P.2d 188 (1974); In re Deschane, 84 Wn.2d 514, 527 P.2d 683 (1974); In re Batali, 85 Wn.2d 246, 533 P.2d 843 (1975); In re Smith, 85 Wn.2d 738, 539 P.2d 83 (1975); In re Robinson, 89 Wn.2d 519, 573 P.2d 784 (1978); In re Gibson, 90 Wn.2d 440, 442, 583 P.2d 633 (1978); In re Cary, 90 Wn.2d 762, 585 P.2d 1161 (1978); In re Hawkins, 91 Wn.2d 497, 589 P.2d 247 (1979); In re Zderic, 92 Wn.2d 777, 600 P.2d 1297 (1979); In re Allper, 94 Wn.2d 456, 617 P.2d 982 (1980).
Despite these strong precedential statements that disbarment results from misuse of trust funds, there have been instances where this court has imposed less severe discipline. In In re Salvesen, 94 Wn.2d 73, 614 P.2d 1264 (1980), we stated that we will look to other acts of misconduct and the presence or absence of mitigating circumstances. For instance, lack of cooperation with the bar investigation may be an aggravating circumstance. But lack of prior discipline and full cooperation will not excuse the conduct. Furthermore, restitution and repentance do not constitute a defense. In re Cary, supra; In re Grant, supra.
[2-4] Given this historical pattern of dealing with trust account violations, we reiterate the considerations inherent in determining the appropriate sanction:
The two basic purposes of attorney discipline are to protect the public from future misconduct of an attorney and to preserve public confidence in the legal system.
In an individual case, however, recitation of disciplinary purposes does not resolve the issue of appropriate discipline, which must be determined by the facts and circumstances of each case. This court has reiterated several considerations in making this determination: (1) the seriousness and circumstances of the offense; (2) avoidance of repetition; (3) deterrent effect upon others; (4) maintaining respect for the legal profession; (5) assurance *379 that those who seek legal services will be insulated from unprofessional conduct.
(Citations omitted.) In re Zderic, 92 Wn.2d 777, 787, 600 P.2d 1297 (1979).
There is no question that respondent's violations were serious and intentional. Only when faced with a bar investigation did respondent disburse the Brandts' funds. But at that time he took other trust funds to cover his earlier defalcations. Finally, respondent compounded his violations of his duty to the public and the bar by falsely and knowingly alleging that his trust account was properly maintained.
Admittedly respondent is now remorseful and contrite. Nothing less would be expected. His remorse is not impressive, however, when viewed in light of his attempts at concealment. For instance, he did not disclose the truth to his clients when finally disbursing the money. In fact, he wrote to Mr. Brandt who had provided the $10,000 settlement money that he was disappointed to learn of the complaint to the bar association. Yet he did not disclose that for more than a year he had been using the heirs' money to pay his office rent, telephone, residential mortgage payments and household expenses.
In cases of this nature, this court asks, Is there a danger of future misconduct and will suspension alone preserve public confidence in the legal system? There is compelling evidence against respondent. When asked why he filed the false affidavit, he stated that the checks written on trust accounts for personal use were not in his mind. Then when asked if he would have filed a different affidavit if these violations were in his mind, he stated that he "didn't know."
It may well be that respondent has learned his lesson and will not repeat his transgressions. But we believe
The nourishment of public trust and confidence in the legal profession, as well as our legal system, demands the utmost fidelity of the attorney with respect to his trust account. In no fashion can the personal invasion of the *380 funds of others deposited in such an account be condoned, justified, or rationalized, whatever the personal urgency of the moment may appear to be, or however faithful to his trust an attorney has been in the past.
Cary, at 765. Public confidence in the legal system would hardly be maintained and furthered by merely suspending a lawyer for 14 intentional violations of his clients' funds followed by attempts to cover up the violation by filing a knowingly false affidavit.
In conclusion, there are no mitigating circumstances that justify not applying the usual sanction of disbarment for intentional use of clients' funds.
Respondent John M. Rosellini is hereby disbarred and his name is stricken from the roll of attorneys in this state. Since we have not been furnished a statement of costs and expenses, none are awarded.
STAFFORD and DIMMICK, JJ., and SHIELDS and THOMPSON, JJ. Pro Tem., concur.
DOLLIVER, J. (dissenting)
John M. Rosellini is guilty. There can be no mistake in that. The record is clear as to his violation of the Discipline Rules for Attorneys and the Code of Professional Responsibility. As Mr. Rosellini states, he did a "terrible thing." He brought disgrace to himself, shame to his family name, and public outcry against himself and his profession.
The majority cites a recent case to spell out those factors which go into and are part of the determination of an appropriate sanction:
The two basic purposes of attorney discipline are [1] to protect the public from future misconduct of an attorney and [2] to preserve public confidence in the legal system....
In an individual case, however, recitation of disciplinary purposes does not resolve the issue of appropriate discipline, which must be determined by the facts and circumstances of each case. This court has reiterated several considerations in making this determination: (1) the seriousness and circumstances of the offense; (2) avoidance *381 of repetition; (3) deterrent effect upon others; (4) maintaining respect for the legal profession; (5) assurance that those who seek legal services will be insulated from unprofessional conduct.
(Citations omitted.) In re Zderic, 92 Wn.2d 777, 787, 600 P.2d 1297 (1979). Cf. Steele & Nimmer, Lawyers, Clients, and Professional Regulation, 1976 Am. B. Found. Research J. 917, 999.
In addition to the two traditional purposes given by this court for attorney discipline, there is another purpose which is inherent in all of the discipline cases. It is perhaps the major purpose of discipline although the court has consistently denied it exists. In re Beakley, 6 Wn.2d 410, 107 P.2d 1097 (1940); In re Brown, 97 Wn.2d 273, 644 P.2d 669 (1982). That purpose is punishment. A wrong has been committed; the court determines the attorney will pay the penalty. The penalty received is the penalty deserved. See A. von Hirsch, Doing Justice (1st ed. 1976).
Although the court is loath to say so, it is punishment in the sense of penalty that provides the real engine for lawyer discipline. The moral sensibilities of the bar  and perhaps the public  have been outraged. There has been a violation and an appropriate punishment will be meted out to the offender. Once the court forthrightly faces up to the punishment function of bar discipline and does not disguise it under a variety of high-sounding and self-serving phrases, I believe it will be able to administer discipline more logically.
The heart of the purpose of preserving public confidence in the judicial system is that the judicial system deserves public confidence because it will track down and punish offenders. One of the hallmarks of a profession is that it will discipline itself. Yarmolinsky, What Future for the Professional in American Society?, Winter 1978 Daedalus 159. It is the operation of this system of discipline  the guilty will be pursued and brought to justice  and not the quantum of the punishment that is foremost in preserving public confidence.
*382 The purpose of protecting the public is served by the pursuit and punishment of offenders and by the severity of the punishment. The offending attorney, if removed from the practice of law for a period by either suspension or disbarment, can no longer harm the public through the practice of law. Furthermore, the offending attorney and other lawyers will be deterred from future disciplinary violations. The purpose of the punishment of the offender is achieved entirely by the nature of the discipline.
What then should be the discipline imposed on John Rosellini? In In re Salvesen, 94 Wn.2d 73, 79, 614 P.2d 1264 (1980), we said "sanctions must be determined on a case-by-case basis". If that is done here, it is my belief the appropriate discipline for John Rosellini should be suspension rather than disbarment.
Whether a lawyer once guilty of a trust account violation has "learned his lesson and will not repeat his transgressions" (majority opinion, at 379), should be the underlying consideration as to the quantum of discipline needed to protect the public. Curiously, this seems to be of no concern to the majority. After having posed the issue, the majority then moves completely away from the question of public protection, and into the arena of public confidence. It then makes the wholly conjectural statement that "Public confidence in the legal system would hardly be maintained and furthered by merely suspending" John Rosellini. Majority opinion, at 380.
I do not share the insights the majority claims in discerning the mysteries of public opinion and public confidence. Neither, of course, can I predict the future moral probity of John Rosellini should he resume the practice of law. Nonetheless, after reading the entire record and considering all of the circumstances in his case, I am drawn to what is for me the inescapable conclusion that John Rosellini, after having committed unpardonable acts, is a person who is of such a character that he is subject to redemption: He has fallen, but he can be saved. I believe that for John Rosellini to remain in the practice of law would in no way *383 endanger the public. He has learned about legal ethics in a far more vivid way than most. I do not believe he will repeat his transgressions. If it were only the protection of the public from John Rosellini that determined the degree of discipline, only a modest sanction would need to be applied.
There remains the question of punishment. A grave offense was committed. It was an affront to the bar and to the moral standards of society. It cannot be condoned; the offender must be punished. What should the punishment be? Against the egregious nature of his offense I believe must be balanced the nature of the punishment John Rosellini already has received. As the record shows, his offenses were for days the major topic of interest in the media. The words of counsel in respondent's brief eloquently describe the situation:
Certain it is, however, that right at the height of the 1980 final election campaign for State Attorney General, after respondent had been nominated by the Democratic Party, the [Seattle Post-Intelligencer] commenced publication of the series of front-page articles about respondent, which articles are in this record as part of Exhibits 7-44, inclusive. And of course the information was picked up and used by other newspapers across the State  it was too sensational to be ignored. The P-I's articles are masterpieces of that genre of journalistic work. They even appeared serially, thus exciting the maximum of curiosity. Buy tomorrow's paper and we'll tell you more of this evil man. Watch him hanging there, turning slowly in the withering winds of our questions and our further disclosures.
Well, I mean no invidious criticism of the P-I. Its conduct was in the course of the nature of the press institution. As well be indignant with the crow who eats the robin's eggs or the weasel who runs the rabbit to earth.
The point is that respondent's transgressions received an enormous amount of publicity. As respondent put it:
Somebody said I had gotten more press in the first few days than the war in Iran got on the front page.
I do not mean to suggest that in a case where there is wide and continuing publicity the punishment should automatically *384 be less than those cases where the transgression of the lawyer receives only a modest notice in the public press, if any, and where the knowledge of the wrongdoing is limited to family, friends and clients. I do believe that in determining the discipline to be imposed, the punishment already received should be considered. Any loss of reputation is punishment; the public destruction of one's reputation is the most severe penalty a lawyer, or indeed any person, can suffer.
It is unarguable that, when confronted with his delinquencies, John Rosellini, the candidate for public office, did not deal with the press with candor. Only those who have never run for public office or been a public official would deny that fear or even terror sometimes haunts political candidates and officeholders who must deal with the press. Most resist the temptation to be less than forthright. John Rosellini did not and paid an awful price.
I would impose a 2-year suspension on John M. Rosellini. Surely this is enough. It would be a full measure of punishment. All of the purposes of the public, the bar, and this court would be met. Disbarment will serve no better to protect the public. It is idle to speculate that a 2-year suspension will somehow be less of a deterrent to other lawyers than that of disbarment. Violations of the rules of discipline are not calculated by such niceties.
What is to be gained by disbarment rather than a 2-year suspension? The best the majority can come up with is the ephemera of "public confidence in the legal system." Does the maintenance of public confidence demand disbarment? Is this court captive to the worst instincts in human nature? I would hope not. Rather, public confidence is built by a Supreme Court which views each litigant as that litigant comes before it; which takes reasonable and appropriate action to protect the public interest and brings appropriate punishment to the offender; and which makes those judgments openly, fearlessly, and without regard to the winds of public opinion.
*385 I would suspend John M. Rosellini for 2 years and, thus, I dissent.
UTTER and WILLIAMS, JJ., concur with DOLLIVER, J.