[No. C.D. 5608.   En Banc.   July 28, 1983.]

*In the Matter of the Disciplinary Proceeding
Against* WILLIAM A. NOBLE, *an
Attorney at Law.*

ROSELLINI, STAFFORD, DORE, and DIMMICK, JJ., dissent by separate opinions.

*Leland G. Ripley,* for Bar Association.

*Shannon Stafford* and *Stafford, Frey & Mertel,* for respondent.

PEARSON, J.—Before us in this case is a recommendation of the Disciplinary Board of the Washington State Bar Association that attorney William A. Noble be suspended for 90 days for misuse of a client's funds in violation of DRA 1.1(c) and CPR DR 9–102(A). We adopt the Board's recommendation, subject to two modifications.

These disciplinary proceedings resulted from a complaint by respondent's brother charging respondent with mishandling his father's estate, of which respondent was executor, and with failure to properly maintain a trust account for clients' funds.

Respondent graduated from the University of Washington and was admitted to practice in 1964. He operated a 1–man domestic practice. Prior to these proceedings, he had been twice censured, in 1975 and 1980, for neglect of legal matters.

Respondent's father died on November 27, 1978, and he was appointed executor and attorney for his father's estate. Under the terms of the will, respondent and his brother were to share equally in the estate. Respondent admitted that over the course of the probate he appropriated to his own use a total of $31,062.01 from the estate. His brother made inquiries about the distribution of the assets of the estate, and when these proved fruitless he filed a complaint with the bar association.

On August 10, 1980, pursuant to this complaint, respondent's books, records, and procedures were examined, and irregularities in his handling of client trust funds were discovered. At times, no trust account was maintained at all, records of the trust account were incomplete, client trust funds were commingled with general funds, and the trust account was occasionally allowed to fall into a negative

balance.

A formal complaint was filed against respondent and a disciplinary hearing was held on October 21, 1981. At that hearing, respondent admitted misappropriation of the trust funds. He claimed, however, in mitigation of his misconduct, that he was suffering from the disease of alcoholism, which had eroded his moral judgment. He presented, in addition to his own testimony, the testimony of his alcohol rehabilitation counselor, Mrs. Helen Mauldin. Respondent testified his alcoholic symptoms began as early as 1974 or 1975 and were recognized by him as such in 1977, when a stressful marital problem developed. His counselor explained that by the time she saw him in December of 1979 all of the "early middle stage" symptoms of alcoholism were present. The following testimony was received:

> Q [Hearing panel officer] I want to be convinced that if alcohol is being advanced as a mitigating circumstance, if alcohol is in this case, I want to be truly convinced that the man is suffering from the disease, not just a sort of a chronic drinker.
> A [Mrs. Helen Mauldin] All of the things I mentioned to date were present with Mr. Noble.
> Q And what were they?
> A Drinking oftener than intended and drinking more than intended. Drinking to relieve stress. Expressed need for alcohol, especially after a period without. Drinking alone. Loss of control of amount of drinking and time spent drinking. Family problems as a result of drinking. Feelings of guilt associated with drinking. And going to my Jellnek test, memory blackouts. That is the morning after, can't remember a part of the evening before. All of these were present in Mr. Noble's case.

The counselor also described at length the effect of alcoholism on its victim:

> We know that alcohol is a depressant drug. One of the first areas that it works on is the frontal section of the brain, which is the seat of reasoning and judgment. So that is the first thing that is depressed by alcohol.
> Continued use of alcohol, continued ingestion of it, leads to a situation where you have alcohol in the blood stream at all times which perpetuates this equation right

here. When you have this individual functioning . . . on drug–affected emotion, with his reasoning powers you might say anesthetized, . . . the individual learns a whole new set of behaviors to deal with functioning this way.

Mrs. Mauldin also testified that the deterioration of the intellect and personality caused by excessive alcohol consumption is not reversed immediately the victim stops drinking. The effects of alcoholism persist for a substantial time after the victim achieves abstinence. Initially, there is a 90–day period following excessive drinking during which alcohol remains in the system and during which no improvement occurs. Only after a 90–day detoxification period do changes occur. In average cases a full recovery takes from 2 to 5 years. In Mr. Noble's case, Mrs. Mauldin testified that recovery was achieved after about 16 months of abstinence, by approximately March 1981.

The hearing officer concluded from this, and similar testimony, that although respondent deliberately took the money from his father's estate, motivated by financial need, his moral judgment at the time was impaired by alcohol. In his findings of fact, the hearing officer concluded:

[a]ccording to his testimony he was under extreme financial pressure to meet obligations, both personal and to maintain his business, and that his judgment was not only clouded but virtually lacking by reason of problems with alcohol which had resulted and progressed to the early middle stages of alcoholism by late 1979.

The hearing officer concluded further that respondent was motivated by financial need but that "[h]is judgment and his moral underpinnings were no doubt eroded to an extent by his use of alcohol and his alcoholism".

Respondent and Mrs. Mauldin also testified that respondent had abstained from alcohol for 18 months, despite the stress caused by the death of his daughter during that period. Mrs. Mauldin's testimony convinced the hearing officer that respondent had conscientiously applied himself to a rigorous rehabilitation program.

At the hearing, the bar association argued for disbarment

of respondent, and respondent's counsel recommended a letter of censure as the appropriate sanction, in light of the mitigating factors. The hearing officer concluded that respondent's appropriation to his own use of funds from his father's estate constituted a violation of DRA 1.1(a) (commission of an act involving moral turpitude, dishonesty, or corruption) and of CPR DR 9–102(A) (failure to preserve the identity of funds and property of a client), but found a number of circumstances which he considered mitigated the violations:

1. Respondent's voluntary and demonstrated success in controlling the problem of alcoholism.

2. Respondent's reasonable cooperation with the bar association in this matter.

3. Respondent's willing acceptance of full responsibility for his actions.

4. A "very fine" attitude on the part of respondent.

5. The lack of a "pattern" of misuse of funds which so often appears in this type of disciplinary action.

Accordingly, the hearing officer recommended suspension for 3 months. The Disciplinary Board unanimously adopted the findings and recommendations of the hearing officer and assessed costs against respondent in the amount of $382.20. Before this court, the bar association agreed that 90 days' suspension was the minimum appropriate sanction.

■ The only issue before us is the appropriate sanction for respondent's violation of the disciplinary rules. Failure to preserve the integrity of client funds leads to disbarment absent extraordinary mitigating circumstances. *In re Moynihan*, 97 Wn.2d 237, 643 P.2d 439 (1982). We must determine, therefore, whether the hearing officer's findings of mitigating circumstances were correct, and if so, whether 3 months' suspension is an appropriate sanction in the light of those mitigating circumstances.

The most significant of the mitigating factors considered by the hearing officer is the matter of respondent's alcoholism. As the testimony summarized in the statement of facts earlier in this opinion demonstrates, the record clearly sup-

ports the hearing officer's findings and conclusions that respondent was suffering from the disease of alcoholism when he converted funds from his father's estate, and that he made strenuous and successful efforts to control his drinking.

The record also supports the conclusions of the hearing officer as to the other four mitigating circumstances. There is no evidence of any failure by respondent to cooperate with the bar association's investigation of the complaint against him. Respondent readily admitted his misconduct. He made apparently sincere and determined efforts to stop drinking. And there is no evidence of any misuse of funds belonging to other clients.

Having concluded that the record supports the hearing officer's determination that mitigating circumstances existed in this case, we proceed to the considerably more difficult question whether 3 months' suspension is appropriate in the light of these circumstances.

First, we note that all of the circumstances noted by the hearing officer have been recognized by this court as factors which in appropriate cases may justify lesser sanctions than would be applied otherwise. Alcoholism was recognized as a mitigating factor in *In re Kumbera,* 91 Wn.2d 401, 588 P.2d 1167 (1979). Acceptance of responsibility and cooperation with the bar in its investigation have been considered relevant. *In re Salvesen,* 94 Wn.2d 73, 614 P.2d 1264 (1980). *Cf. In re Stroh,* 97 Wn.2d 289, 644 P.2d 1161 (1982). And a pattern of misappropriation has been held to demand more severe sanctions than an isolated violation. *In re Moynihan, supra.* The mitigating factors considered by the hearing officer were therefore appropriate.

We now turn to consider whether these factors justified the imposition of a 90–day suspension. We conclude that they do. A review of cases in which we have considered suspension rather than disbarment for trust account violations indicates that suspensions from 60 days (*e.g., In re Nelson,* 87 Wn.2d 77, 549 P.2d 21 (1976)) up to 2 years (*e.g., In re Salvesen, supra*) have been imposed. No clear

formula has emerged for determining what period of suspension is appropriate in a particular case. An indication of the difficulty in making this determination can be seen in *In re Kumbera, supra.* In that case, the Disciplinary Board recommended a 3–year suspension; a majority of this court imposed a 1–year suspension, and the dissent urged disbarment. Clearly, there is considerable room for disagreement. *See also In re Witteman,* 95 Wn.2d 936, 631 P.2d 961 (1981).

We are convinced the disagreement stems in part from the fact that we have developed no objective standard by which to measure the appropriateness of disciplinary sanctions in a particular case. The development of such an objective standard, although by no means a simple task, is nevertheless one to which we now direct ourselves.

■ As an important preliminary matter, our consideration of the appropriate sanction should take into account the elaborate procedure for disciplinary actions established by the Discipline Rules for Attorneys. All disciplinary matters not disposed of by way of stipulation (DRA 3.3) are heard by a hearing panel. DRA 3.2. The findings, conclusions and recommendations of the hearing panel are reviewed by the Disciplinary Board of the state bar association. If the Board recommends suspension or disbarment or if the attorney objects to a censure or reprimand, the matter comes before this court for review. DRA 5.6(h). A significant feature of this scheme is that not all disciplinary matters reach this court—only the more serious cases requiring suspension or disbarment. The only body in the state to consider the full spectrum of disciplinary matters from the most trivial to the most serious is the Disciplinary Board. It is appropriate, therefore, that we give serious consideration to the recommendations of the Disciplinary Board. As the only body to hear the full range of disciplinary matters, the Board has the opportunity to develop unique experience and perspective in the administration of sanctions. We should not lightly depart from recommendations shaped by this experience and perspective.

Of course, the ultimate responsibility for determining the nature of discipline rests with this court and not the Disciplinary Board. *In re Espedal,* 82 Wn.2d 834, 838, 514 P.2d 518 (1973). We do not intend to abdicate this responsibility. Nevertheless, in fulfilling this responsibility, it is appropriate that we be guided by the recommendations of the Disciplinary Board. Accordingly, we will adopt the sanction recommended by the Disciplinary Board unless we are able to articulate specific reasons for adopting a different sanction.

In evaluating the Board's recommendation, we will consider a number of factors. We will adopt the Board's recommendation unless one or more of these factors clearly persuades us that the sanction recommended by the Board is inappropriate.

First, we will consider the purposes of attorney discipline. Because we are committed to the proposition that discipline is not imposed as punishment for the misconduct, then our primary concern is with protecting the public and deterring other lawyers from similar misconduct. The severity of the sanction should be calculated to achieve these ends. Accordingly, the Board's recommendation may be modified where the recommended sanction is clearly insufficient to protect the public from future misconduct of the kind at issue and to deter other attorneys from such misconduct.

Second, we will consider whether the sanction recommended by the Board is proportionate to the misconduct. This is at best an inconclusive determination. Comparison of the recommendation with sanctions imposed in similar cases may sometimes be of assistance. Such comparisons will seldom be determinative, given the infinite variety of misconduct and of aggravating and mitigating factors. Nevertheless, a recommendation of the Board might not be adopted where it departs significantly from sanctions imposed in similar cases.

Third, we will consider the effect of the sanction on the attorney. We will not blind ourselves to the hardships cre-

ated by disbarment or suspension. In some cases, it might be concluded that the recommended sanction is clearly excessive, weighing the nature of the misconduct against the hardships imposed on the attorney.

Fourth, the Board's recommendations must, of course, be fairly supported by the record developed by the hearing panel. Consequently, we might refuse to adopt a recommendation which is based on considerations not supported by the record, or which ignores material factors established by the record.

Finally, the weight given a recommendation of the Board may well vary according to the extent of agreement among members of the Board. We will hesitate to reject a unanimous recommendation in the absence of clear reasons for doing so. A recommendation from which there is a dissent may well be more readily rejected.

We turn now to consider the recommendation of the Board that respondent be suspended for 90 days, considering each of the five factors in turn.

First, we consider the purposes of bar discipline. The first purpose is protection of the public. In our opinion, a reasonable person with knowledge of all the facts and circumstances of this case would conclude that a lawyer held in high esteem by his peers, who had no disciplinary problems until developing the disease of alcoholism, who committed the violation while his mind and moral judgment were affected by the disease, who has successfully undergone treatment and is now cured of the disease, does not pose a threat to any future clients to the extent that a longer period of suspension is warranted. The Board's recommendation also appears to satisfy the deterrence aspect of bar discipline. On the one hand, any sanction is unlikely to have a deterrent effect on lawyers suffering from alcoholism given the nature of that disease. On the other hand, a reasonable and sober lawyer with knowledge of all the facts of this case will be aware of the serious consequences of even a 90-day suspension. We consider these consequences below in our discussion of the third factor. They

appear sufficient to deter misconduct of the kind before us in this case.

The second factor is proportionality of the recommended sanction to respondent's misconduct. As we note above (at page 93), the recommended sanction is within the range of sanctions imposed for trust account violations where mitigating factors were present. We cannot conclude that 90 days' suspension is clearly disproportionate to the misconduct.

Third, we consider the effect on respondent of 90 days' suspension. These consequences are not trivial. For 3 months he may not accept any new retainer or act as an attorney in any case or legal matter of any kind. DRA 6.7(c). He must notify all clients he is representing in pending matters that he has been suspended and is unable to act as an attorney for 3 months. He must notify attorneys representing adverse parties in any pending litigation or administrative proceedings that he has been suspended for 3 months. DRA 6.7(a), (b). A notice proclaiming his suspension will be published in the Washington State Bar News and a newspaper of general circulation in the county in which he practices. DRA 6.7(d)(3). A copy of the notice of suspension will be sent to the presiding judge of the superior court in the county in which he practices. DRA 6.7(f).

These provisions make clear that the order of suspension does more than require respondent to take a 3–month vacation from practice from which he can return as if nothing had happened. To be sure, respondent will be denied the income from his practice for 3 months, and this may represent a significant pecuniary loss to him. However, there are more serious costs imposed by suspension. Respondent's relationships with his clients, staff, and other members of the profession will be impaired by the disciplinary procedures. Those clients whom he is representing in pending matters will be notified of the suspension. Their confidence and trust in respondent will doubtless be shaken, and some clients may seek legal representation

elsewhere. Respondent's staff may well be unwilling to accept 3 months without work and may seek employment elsewhere. Other lawyers with whom respondent must work every day, including judges before whom he may appear, will be notified of his breach of ethics.

Effective practice demands the trust and respect of one's fellow practitioners, and loss of that trust and respect is a heavy burden to shoulder. Respondent's working relationships with other lawyers will therefore be strained by the tarnishing of his professional reputation. Moreover, a lawyer's good reputation among his clients and colleagues and in the world of trade and commerce is the source of much new business, and the loss of that reputation will be felt beyond the 90 days' suspension. That suspension represents, therefore, considerably more than a "slap on the wrist" for respondent. It is a serious measure with serious consequences, which are well known to all lawyers who are engaged in the active practice of law.

The sanction recommended, therefore, reflects the serious nature of respondent's misconduct. It also recognizes, however, that respondent's transgression stemmed from a disease, rather than a deliberate and evil intent. A longer suspension (of 2 years, for example) would effectively destroy any reasonable chance for respondent to readily salvage his law practice or maintain his clientele. The Board's recommendation, therefore, appears appropriate.

The fourth factor to consider is whether the Board's recommendation is fairly supported by the record. Our review of the record convinces us that the Board neither ignored material considerations nor considered matters not supported by the record.

Finally, we note that the Board was unanimous in its recommendation. This is a further reason which persuades us to adopt that recommendation.

We conclude from our consideration of these five factors that the Board's recommendation is reasonable and we accordingly adopt it. Respondent is suspended from the practice of law for 90 days.

■ We find it necessary, however, to modify the Board's recommendation in two respects. First, respondent paid himself a total of $4,000 for his services as executor and attorney for his father's estate. His conduct, however much mitigated, should preclude his retention of this. *In re Loomos,* 90 Wn.2d 98, 579 P.2d 350 (1978). Accordingly, we order that one–half of this fee be refunded to the estate. Second, it appears from respondent's brief that his father's estate has not yet closed, and he owes his brother $2,147 of his share of the estate. Respondent should not return to practice until these matters are put right.

Accordingly, we order that respondent be suspended from practice for 90 days, and that the suspension shall continue beyond 90 days unless and until respondent returns executor and attorney fees he charged for handling his father's estate, pays his brother the $2,147 still owing him from the estate, and arranges for payment of taxes and interest necessary for the closing of his father's estate. An affidavit must be filed with this court that these matters have been accomplished before this suspension will be lifted. The bar association is awarded costs in the amount of $382, plus any costs expended in proceedings before this court.

WILLIAMS, C.J., and UTTER, BRACHTENBACH, and DOLLIVER, JJ., concur.

STAFFORD, J. (concurring in part, dissenting in part)—I agree with the majority insofar as it recites the facts and concludes that respondent's conversion of estate funds was related to his alcoholism. Further, I agree that in a proper case, alcoholism may be weighed as a mitigating circumstance in a disciplinary action. I do not agree, however, that the remaining factors considered by the majority amount to the "extraordinary mitigating circumstances" required by *In re Moynihan,* 97 Wn.2d 237, 643 P.2d 439 (1982). The remaining so–called "mitigating" factors are nothing more than actions one would normally expect of any lawyer who

hopes to make a good impression on a disciplinary authority; these do not rise to the dignity of being "extraordinary mitigating circumstances". Thus, I do not agree that the factors recited by the majority should so extensively lessen the impact of the discipline.

The majority correctly observes that there is a need for an objective standard by which to measure the appropriateness of disciplinary sanctions. Further, I agree with the five factors suggested for determining the proper sanctions.

I am compelled to dissent, however, insofar as the insufficient discipline is concerned. I feel that adequate discipline, in a case such as this, demands a suspension of at least 2 years. In addition to the conditions imposed by the majority, I would require the submission of semiannual reports to the bar association by respondent's alcoholism treatment counselor. An unsuspecting public should not again be subjected to the abuses of such a practitioner.

ROSELLINI, J. (dissenting)—Mr. Noble's case raises once again the troublesome question of what sanction is appropriate for the attorney who invades trust accounts. Both the majority and concurring/dissenting opinions suggest suspension—though of differing lengths—is warranted. I disagree.

Despite recent attempts to enunciate a formula for attorney discipline, *see, e.g., In re Rosellini,* 97 Wn.2d 373, 646 P.2d 122 (1982) (Dolliver, J., dissenting); *In re McGrath,* 98 Wn.2d 337, 655 P.2d 232 (1982) (Williams, J., dissenting), the fact remains that the question of appropriate punishment for attorney misconduct is a highly subjective determination. Only this court may revoke or suspend an attorney's license to practice law, and each of us brings our own experience, judgment and morality to bear on that question. But here, as elsewhere in the law, we cannot disregard the role of precedent. Precedents temper the subjectivity of these decisions, provide guidance in judging the conduct of each lawyer and give notice to other attorneys of the likely consequences of their acts. Thus, I view with

alarm the departure from the well established rule that trust fund violations will be met with severe sanctions, most often disbarment. As we said in *In re Rosellini, supra,* and elsewhere,

> lawyers who mishandle trust funds, who fail to maintain complete records of trust funds and who fail to account and deliver funds as requested are reminded that disbarment is the usual result."

*Rosellini,* at 377 (quoting from *In re Deschane,* 84 Wn.2d 514, 516–17, 527 P.2d 683 (1974)). In *Rosellini,* we cited 46 cases in which we adhered to this rule. Nothing in the majority or concurring/dissenting opinions, or the record persuades me that we should not adhere to that rule here.

The record presents the following facts for our consideration. Alvord Noble died in November 1978. He left two children, William and John Noble. Each son was to receive one–half of the estate. William was also appointed executor and attorney for the estate. With the exception of an initial cash disbursement, the family car and some furniture, William Noble converted the entire estate for his own use. Mr. Noble admits that he converted these funds but offers his alcoholism as an explanation for his behavior. The hearing officer found that the conversion had occurred but that significant mitigating factors supported his recommendation of only a 90–day suspension. I disagree.

First, the hearing officer improperly concluded that the fact the respondent had stolen from a "family" estate was relevant. It is not. As we said in *In re Cary,* 90 Wn.2d 762, 765, 585 P.2d 1161 (1978):

> Respondent's familial relation to the other remainder persons of the trust does not alter the ethical standards and responsibilities which he, as an attorney, was sworn to uphold. Acting, as he was, in a fiduciary relationship to his sisters, he owed to them, as beneficiaries of the trust, the highest degree of good faith, care, loyalty, and integrity, as well as the obligation to fully, timely, and honestly inform them of all facts which would aid them in protecting their respective interests.

In *Cary,* we disbarred the attorney for offenses similar to

those committed by William Noble. Despite our opinion in *Cary*, the hearing officer characterized this event as an "unauthorized and impermissible 'borrowing'." It was not. If anything, theft from a family estate is even more egregious, because a family member will frequently allow slight irregularities and delay that others would investigate. The arm's length dealing present with strangers is therefore not present and the attorney is in a better position to engage in misconduct without detection. Thus, an attorney who appropriates "family funds" has violated two trusts, first, that the law places in him and, second, that upon which the relative relies.

Turning to the other mitigating circumstances relied upon by the various opinions in this case, these too should be rejected. Noble's principal excuse for his conduct is his problems with alcohol. Respondent presented the testimony of one Helen Mauldin, an alcohol abuse counselor. Ms. Mauldin testified that Mr. Noble first came to her in December 1979 and enrolled in a counseling program. According to Ms. Mauldin's reports, Mr. Noble took several months to achieve complete abstinence which he maintained throughout his treatment. From this testimony, one would conclude that Mr. Noble was free of the effects of alcohol by March or April of 1980, although he continued in counseling. Mr. Noble testified, on the other hand, that he achieved complete abstinence by June 1980. Regardless of which date is used, there are several checks written at least a month after Mr. Noble had stopped using alcohol. The record contains copies of checks made out to William Noble from his trust accounts. The dates of these checks are July 6, 1980 ($150), July 15, 1980 ($500), July 29, 1980 ($400) and July 30, 1980 ($550). Mr. Noble admits using these funds for his own personal use, *see* Report of Proceedings, at 62, but attempts to excuse this behavior by referring to it as an effort to pay off his earlier lifestyle. Nonetheless,

[i]n no fashion can the personal invasion of the funds of others deposited in such an account be condoned, justified, or rationalized, *whatever the personal urgency* of

the moment may appear to be, or however faithful to his trust an attorney has been in the past.

(Italics mine.) *In re Cary,* at 765. The majority, by accepting this explanation, condones such behavior.

The other mitigating factors suggested by the hearing officer also should be rejected. Evidence of remorse and "fine attitudes" after discovery, in and of itself, should not be considered a mitigating factor. "Nothing less would be expected." *In re Rosellini,* at 379. In addition, there are aggravating factors to consider. First, respondent has not completely repaid these funds. Second, his cooperation with the bar association occurred only after the complaint was filed. Third, this attorney has twice before been censured for inappropriate conduct. Finally, contrary to the hearing officer's findings, the respondent has demonstrated a pattern of misuse of funds. During this entire period, he failed to maintain the required trust records and consistently applied one set of client funds to pay another's obligations. See exhibit 3. Under these circumstances, disbarment should be the result.

DORE, J. (dissenting)—Noble, while serving as executor and attorney for his father's estate, arranged for the sale of 450 shares of Alcoa stock. The sale netted the estate $21,318.01. Noble admitted he converted these funds to his own personal use. Another estate asset was a real estate contract which Noble sold for $9,744, converting this money to his personal use. Other estate funds in the total amount of $4,592.25 were transferred from the estate to Noble's general office account and used for office expenses. Noble also allocated $4,000 to himself as attorney and executor. On August 10, 1980, his brother John complained to the bar association about his brother's handling of their father's estate. As a result of this complaint, a trust account examination was conducted pursuant to DRA 13.1. That examination revealed: (1) failure to maintain client ledger; (2) negative trust account bank balances; (3) the removal of "fees" from trust without accounting to client; (4) commin-

gling funds; (5) use of estate funds to pay obligations to other clients; and (6) use of funds of one client to pay obligations to another client. Noble had previously received censures on June 19, 1975 and May 7, 1980 for neglecting legal matters.

The majority's 90–day suspension of William Noble is woefully inadequate. Other lawyers presenting their cases before this court have been disbarred and suspended for long periods of time on far less compelling records. In May of last year, John Rosellini was disbarred for using $10,640.11 of trust monies that came into his possession during the probate of an estate. In *In re Rosellini,* 97 Wn.2d 373, 377, 646 P.2d 122 (1982), the majority stated:

> We are faced with a disciplinary matter where an attorney over a period of 8 months intentionally invaded a trust fund containing his clients' funds.
>
> This court has long disbarred attorneys for such flagrant violation of their professional and fiduciary duties. We have said: "[t]hose few lawyers who mishandle trust funds, who fail to maintain complete records of trust funds and who fail to account and deliver funds as requested are reminded that disbarment is the usual result." *In re Deschane,* 84 Wn.2d 514, 516–17, 527 P.2d 683 (1974).
>
> Over the years trust account violations have led to disbarment in these cases.

The majority then cited 46 disbarment decisions of this court, continuing at page 378:

> Despite these strong precedential statements that disbarment results from misuse of trust funds, there have been instances where this court has imposed less severe discipline. In *In re Salvesen,* 94 Wn.2d 73, 614 P.2d 1264 (1980), we stated that we will look to other acts of misconduct and the presence or absence of mitigating circumstances. For instance, lack of cooperation with the bar investigation may be an aggravating circumstance. But lack of prior discipline and full cooperation will not excuse the conduct. Furthermore, restitution and repentance do not constitute a defense. *In re Cary,* [90 Wn.2d 762, 585 P.2d 1161 (1978)]; *In re Grant,* [4 Wn.2d 617, 104 P.2d 602 (1940)].

This court found no mitigating circumstances in *In re Rosellini* even though Rosellini had returned the money on his own 2 years before the bar association had knowledge of his transgression, and he was repentant and cooperative. This court acknowledged Rosellini's remorsefulness, but concluded it was not "impressive . . . when viewed in light of his attempts at concealment". *Rosellini*, at 379.

In contrast to the *Rosellini* case, Noble appropriated to his own personal use trust funds of not $10,000, but in excess of $35,000. The majority states, "The most significant of the mitigating factors considered by the hearing officer is the matter of respondent's alcoholism". Majority, at 92. A careful reading of the subject record, however, reveals that alcoholism had little or nothing to do with Noble's stealing of estate funds. Noble's testimony reveals that his misuse of trust funds was motivated by financial, rather than alcoholic, pressures.

Q: And you also admit that you converted that sum of money to your personal use. What did you do with that money?
A: What did I do with it?
Q: Uh–huh.
A: What I did with it was 15 thousand dollars went to income taxes.

Referring to the $9,744 that he received from the sale of the land contract, Noble testified:

Q: In your answer you also admitted that you converted $9,744 from the sale of land under the contract to your own use. What did you do with those funds?
A: Same answer.
Q: Used it for taxes?
A: Used it for personal necessary expenses and bills.

. . .

Q: Have the inheritance taxes been paid on this estate?
A: No, I have not paid them.
Q: Why not?
A: Because I have been scraping to survive and haven't raised the money to do that. I will do so.
Q: Have all the estate debts been paid?
A: Not all of them, no.

Noble says that at the time of the conversion of the estate funds "his judgment was impaired by alcoholism". On reading Noble's testimony, however, one might conclude that he was under *extreme* financial pressure to pay his personal and business bills and to remain in business, and he deliberately used estate trust funds to bail himself out of his financial difficulties. It was nearly a year later, after the conversion of the funds, that he sought professional help with his alcohol problem. Mrs. Helen Mauldin, who works in the alcoholism field, was called as the respondent's expert on his alcohol problem. She categorized the three stages of alcoholism as "early stage, middle stage and late stage. There are three categories of each stage, beginning, middle and late". Mauldin testified that Noble fit in the beginning middle stage of alcoholism, "which is, in fact, quite early on". Report of Proceedings, at 44. The record indicates that after the theft of estate funds, Noble began drinking heavily, bringing on a progressive alcoholic problem. There is little, if any, evidence that alcohol had much to do with the original conversion of estate funds. It is not unusual that a person fortifies himself with alcohol before undertaking a crime, in order to deaden his responsibility for what he is about to do. However, on this record, alcohol can only be a slight mitigating factor in the conversion, but is no excuse for not returning the stolen funds.

Underlying Noble's testimony is the justification that he owned one–half of the estate assets and was only stealing one–half of the estate assets from his *brother*. In *In re Cary*, 90 Wn.2d 762, 765, 585 P.2d 1161 (1978) we rejected this rationale in reference to a lawyer stealing from his sisters, stating:

> Respondent's familial relation to the other remainder persons of the trust does not alter the ethical standards and responsibilities which he, as an attorney, was sworn to uphold. Acting, as he was, in a fiduciary relationship to his sisters, he owed to them, as beneficiaries of the trust, the highest degree of good faith, care, loyalty, and integrity, as well as the obligation to fully, timely, and honestly inform them of all facts which would aid them in

protecting their respective interests. *Esmieu v. Schrag*, 88 Wn.2d 490, 563 P.2d 203 (1977).

Noble has been the subject of two previous censures, one in 1975 and one in 1980, which involved a probate and a dissolution matter. It is interesting that the second censure was *subsequent* to the charge involved here. The hearing officer found "[r]espondent's two previous censures cannot be overlooked. In fact, Rule 10.1 provides that three censures in and of themselves can subject an attorney to suspension."

State bar counsel, after an extensive investigation, recommended to the Board of Governors:

> In view of the fact that respondent's misconduct of appropriating estate funds continued after he had achieved sobriety; involved the taking of a fee to which as a matter of law he was not entitled; because there was a pattern of misuse of trust funds; and because Noble admitted he would not advise a client to engage in the conduct that he engaged in, if the Disciplinary Board concludes that disbarment is not an appropriate sanction, Noble should be suspended for a period of one year with an additional 30 day suspension suspended for two years on the following conditions:
>
> (1) that Noble repay the $4,000.00 in fees he is not entitled to;
>
> (2) that Noble repay his obligation to his brother on a definite schedule of monthly payments;
>
> (3) that Noble pay the taxes and close the Estate within a definite time frame;
>
> (4) that respondent's trust account be subject to periodic review;
>
> (5) that Noble submit quarterly reports from his alcohol treatment counselor regarding continued abstinence.

On October 29, 1981, the state bar counsel's recommendation of 1 year suspension was modified to a recommended 90-day suspension by the hearing officer. It is interesting that the hearing officer's finding of fact 9, in referring to the $2,147 still owed to the brother and the $705.78 plus interest owed to the State of Washington, stated "Until these items are paid the estate remains uncompleted. Noble

anticipates accomplishing this and closing the estate *in less than ninety days*". (Italics mine.)

Six months ago Noble advised us that he had left the practice of law. He said he had advised his clients, in writing, that he would no longer be practicing law and they should seek other legal counsel.

Although Noble has never repaid the monies to his brother or the State of Washington or other creditors, or repaid the $4,000 ill–gained attorney fee, the majority continues to speak of the Board of Governors' recommended 90–day suspension, which was predicated on the assumption that such payments would be paid within 90 days from October 29, 1981.

CONCLUSION

The revised Noble record reads as follows: (1) Noble has left the practice of law and to the best of my knowledge may never seek to practice again; (2) after 4 years he hasn't paid his brother $2,147, or the State of Washington $705.78, or other creditors; (3) he hasn't returned the $4,000 attorney and executor fee which he told the hearing officer on October 29, 1981 he would return within 90 days; (4) as over 4 years have passed, the statute of limitations has probably insulated Noble from any civil liability.

A 90–day suspension under the facts of this case will not "protect the public and deter other lawyers from similar misconduct". I realize that suspension and disbarment cases are decided on a case–by–case basis. We must, however, endeavor to achieve some fairness and uniformity in dispositions. How can we justify disbarring John Rosellini for converting trust funds which he repaid prior to a bar complaint, and suspending Noble for 90 days when he hasn't repaid all of the converted trust funds 4 years later?

I would recommended a minimum 2–year suspension for Noble, with the proviso that, within 90 days from filing this opinion, he (1) repay the $4,000 in fees he is not entitled to and had previously drawn; (2) pay the $2,147 obligation to his brother; and (3) pay state inheritance taxes and all

other estate bills. In the event that said funds are not repaid within 90 days, I would summarily disbar him.

DIMMICK, J., concurs with DORE, J.