66 P.3d 1069 (2003)
149 Wash.2d 262
In the Matter of the DISCIPLINARY PROCEEDING AGAINST Steven C. MILLER, Attorney at Law.
No. 06234-0.
Supreme Court of Washington, En Banc.
Argued January 23, 2003.
Decided April 24, 2003.
*1070 Gordon Murray Tilden, Jeffery Tilden, Franklin Cordell, Linda Eide, Seattle, for petitioner.
Henderson & Grow, Clinton Henderson, Clarkston, for respondent.
BRIDGE, J.
The Washington State Bar Association (WSBA) appeals the majority[1] recommendation of the Washington State Bar Association Disciplinary Board (Board) that Steven C. Miller be suspended from the practice of law for 18 months. This recommendation stems from Miller's violations of Rules of Professional Conduct (RPC) 1.8(a), 1.8(c) and 8.4(c). Although the hearing officer for this case recommended disbarment, the Board found that mitigating factors and proportionality review made suspension the more appropriate sanction. We are in agreement with the hearing officer and conclude that Miller should be disbarred.

I

Statement of the Facts
Miller was admitted to the WSBA in 1975, and has no prior record of discipline. The charges against Miller arose from his dealings and interactions with his client, Mamie Rose Ottomeier.
Ottomeier was born on May 6, 1908 in Cheney, Washington, and lived there all of her life. She had one sister and four brothers, all of whom predeceased her. She was never married and had no children. When Ottomeier died in 1994, her estate was valued at in excess of $750,000.[2]
In 1989, Ottomeier began needing assistance with her day-to-day activities because she suffered from diabetes and was losing her sight. Diane Smith, Ottomeier's great niece, moved in with Ottomeier to assist her. When Ottomeier's health further deteriorated, she voluntarily entered the Cheney Care Center in March of 1990. During her stay at this nursing home, Smith visited her at least twice a week. However, Ottomeier became very depressed and started to believe that Smith was the one responsible for placing her in the nursing home. Ottomeier returned to her home in March of 1991, and shortly thereafter accused Smith of stealing various items. These accusations eventually led to Ottomeier and Smith having no further contact with one another.
Miller began doing occasional legal work for Ottomeier beginning in 1982. Prior to 1990, Miller regarded Ottomeier as a friend and occasional client, but he did not have a close personal relationship with her. The legal work Miller did for Ottomeier during this time period included drafting at least two unexecuted wills (February 1990 and March 1991). Miller also prepared a durable power of attorney at Ottomeier's request in February 1990. This document designated him as the attorney-in-fact for Ottomeier in the event of her disability. When Ottomeier wanted to leave the nursing home, Miller was the one who helped her return home. By the summer of 1991, Miller was frequently stopping by Ottomeier's home after work. He brought her food to eat, filled her insulin syringes, and provided companionship. At a time when her need for physical and medical assistance had increased, Miller became extensively involved in Ottomeier's personal affairs, while her contact with family and *1071 friends decreased. Miller was aware that Ottomeier was becoming dependent on him. During this time, he continued performing legal work for her.
In September of 1991, Ottomeier informed Miller that she wanted to make changes to her will, including naming Miller a beneficiary under her will. This new will made Miller the residual beneficiary of Ottomeier's estate. Specifically, in the event that Ottomeier's brother, Mills, predeceased her, the residue of Ottomeier's estate would immediately pass to Miller upon her death. Miller and his secretary prepared the will.
After the September 1991 will was drafted, Miller arranged for Ottomeier to meet with Spokane attorneys Edward Goss and Linwood Sampson to review and witness the execution of the will. Goss and Sampson tape-recorded their meeting with Ottomeier, at which Ottomeier acknowledged that Miller should receive some money, but she was not certain as to how much. She expressed uncertainty about her residuary estate and stated that she had not given much thought as to how much Miller should receive.[3] At the conclusion of their meeting with Ottomeier, Goss and Sampson witnessed Ottomeier's execution of the September 1991 will finding that she had testamentary capacity, that she had considered her family in making her testamentary decision, and that she had some understanding of her assets being disposed of by the will. After the execution of this will, Miller continued to perform legal work for Ottomeier.
In May of 1992, Ottomeier requested that Miller draft a codicil to her will, which eliminated a specific property bequest to a friend and bequeathed a car to another friend. Attorney Sampson witnessed the execution of this codicil in Ottomeier's home after concluding that she understood the codicil and it expressed her desires.[4] Miller drafted yet another will for Ottomeier in February of 1993. This will eliminated many of the specific bequests that existed in the September 1991 will. The only remaining gifts were a trust for Ottomeier's brother, and the residuary estate to Miller. Once again, Sampson witnessed the execution of this will at Ottomeier's home.[5]
In March of 1993, Miller arranged for Ottomeier to add his name to her certificate of deposit (CD), which was valued at approximately $192,000. In the spring of 1993, Miller sought to build a home. To do so, he attempted to obtain a personal loan from Farmers and Merchants Bank using Ottomeier's CD as collateral. The bank refused Miller's request to use the CD as collateral because he was not allowed to do so without Ottomeier's consent. Miller then obtained Ottomeier's signature on an authorization form that allowed him to use the CD as collateral for the personal loan. Miller also prepared a 30-year note and accompanying mortgage promising to repay Ottomeier the principal amount of $192,810.42 at a below-market interest rate of five percent.[6] Miller never provided Ottomeier with written disclosure of the terms or possible consequences of the loan, nor did he give Ottomeier an opportunity to seek the advice of independent counsel before having his name added to the CD and using the CD to secure a line of credit. Miller also had Ottomeier execute a satisfaction of mortgage; however, there is no evidence that Miller advised Ottomeier of the legal consequences of signing the satisfaction. The mortgage Miller prepared covered *1072 a piece of property (Ridgeview property) owned by Miller. This mortgage was never recorded and there is no evidence that Ottomeier received any written disclosure of the potential consequences of failing to record the mortgage. Miller did not suggest or give Ottomeier time to seek advice from independent counsel regarding this transaction.
Ottomeier's CD matured on July 25, 1993, at which point Miller cashed it out, paid off his credit line, and placed the remaining proceeds in his personal savings account. Miller used the proceeds to construct a home on the Ridgeview property, which was the subject of Ottomeier's unrecorded mortgage. Miller claims that he advised Ottomeier to seek the advice of Sampson before Miller cashed out the CD, but that she refused to do so. There is no evidence in the record to support this contention.
Miller finished the construction of his home in March of 1994, and then applied for a $60,000 loan from Cheney Federal Credit Union. The loan application required him to disclose all liabilities and pledged assets as well as all real estate owned, the amount of any mortgages and liens on such real estate, and the amount of any mortgages made. Miller did not list the mortgage owed to Ottomeier on this loan application. Although he properly listed the Ridgeview property as an asset, he falsely indicated that the amount of the mortgage on the property was zero dollars. The $60,000 loan was approved and closed in 1994. At the time, Miller signed a deed of trust covering the Ridgeview property to First American Title Insurance Company, trustee for Cheney Federal Credit Union. This deed was properly recorded on May 2, 1994. Since Ottomeier's mortgage was never recorded, Cheney Federal Credit Union was put into a superior position as against Ottomeier. Miller never disclosed to Ottomeier his intent to give Cheney Federal Credit Union a superior position, and there is no evidence that Miller gave Ottomeier reasonable opportunity to seek advice from independent counsel regarding this matter.
Miller claims that shortly after the closing of the Cheney Federal Credit Union loan, Ottomeier forgave the loan she made to him. Miller testified that he had made 13 payments of $1,035.05 each to Ottomeier, after which she agreed to make a substantial gift by foregoing the remaining $189,477.65 owing on the loan.[7] The only evidence Miller has offered for support of this gift is the repayment schedule on which the word "forgiven" is writtenin Miller's handwriting. There is no indication in the record that Miller memorialized the claimed forgiveness of the loan or that Miller gave Ottomeier an opportunity to seek the advice of independent counsel before she allegedly forgave the loan.
Ottomeier's health continued to decline and in the spring of 1994, Miller found her in an unresponsive state. She was hospitalized due to complications relating to her diabetes. After Ottomeier's discharge from the hospital, Miller sought a certificate of incapacity from Dr. Roger Garvin for purposes of invoking the durable power of attorney. Dr. Garvin wrote to Miller on June 8, 1994, declining to certify Ottomeier's incapacity.[8] However, due to Miller's persistence, Dr. Garvin signed a physician's statement on June 13, 1994, certifying Ottomeier's disability without ever having examined her.[9] Miller never had another physician examine Ottomeier for the purpose of evaluating competence, nor did he alert Ottomeier's family to her condition.
Ottomeier passed away either late at night on October 17, 1994, or in the early morning hours of October 18, 1994. Miller began the probate of Ottomeier's estate by 10:00 A.M. on the 18th, and was appointed the personal representative pursuant to her will. That same morning, Miller obtained letters testamentary, which he immediately used as authority to transfer Ottomeier's assets into his personal accounts. Also on that morning, Miller called a customer service representative at Farmers and Merchants Bank in Cheney to inform her that he would be in shortly to transfer Ottomeier's assets, and that the representative should accomplish the transactions *1073 as quickly as possible. Miller came into the bank that midday and with the help of the representative, completed such transactions. During his time in the bank, Miller commented to the representative that the transactions needed to be completed on an urgent basis because if Ottomeier's family found out what Miller was doing, they would cause trouble.
Shortly after Ottomeier's death, a few of her family and friends became aware that her February 1993 will left her entire estate to Miller. The group of family and friends filed a petition on October 25, 1994 in Spokane County Superior Court contesting the will and seeking to overturn it on grounds of undue influence. The family and friends also obtained a restraining order against Miller prohibiting him from the use of the estate's assets until a show cause hearing could be held. The superior court later found that Miller "transferred funds from estate accounts subsequent to the entry of the Restraining Order entered by the Court on October 25, 1994."[10]
The will contest was tried by Judge Larry M. Kristianson on August 21, 1995. Judge Kristianson entered findings of fact and conclusions of law on October 3, 1995, which included the following conclusion of law and order:
The Wills of Mamie Ottomeier dated February 23, 1993, and September 25, 1991, should be set aside because they ... were the product of undue influence exerted by Steven Miller over Mamie Ottomeier.[[11]]
Further, Judge Kristianson invalidated the alleged inter vivos gift of the "forgiven" loan:
Steven C. Miller must return to the estate, the sum of $195,891.98 plus accrued interest at the rate of 5% from June 1, 1994, to October 3, 1995, and the statutory rate for judgments thereafter.[[12]]
Miller appealed Judge Kristianson's decision to Division Three of the Court of Appeals, which affirmed Judge Kristianson's holding in an unpublished opinion.[13]
While his appeal to the Court of Appeals was pending, Miller filed a voluntary petition under chapter 13 of the United States Bankruptcy Code on March 1, 1996. By that time, Miller had paid approximately $197,000 on the decision rendered by Judge Kristianson.[14] Miller's bankruptcy petition and schedules reflected unsecured debt in the amount of $181,770, of which approximately $91,000 was owed to the estate and the petitioners in the will contest.[15] Since receiving his discharge, Miller has not made any effort to voluntarily repay the remaining restitution to the will contest petitioners and there is no evidence to suggest that he intends to pay it in the future.

Procedural History
The WSBA filed a formal complaint against Miller on July 28, 1999, charging him with the following three counts of misconduct:

Count I
... By preparing the 1991 will, and/or the 1992 codicil, and/or the 1993 will, and/or the authorization allowing him to use Ms. Ottomeier's CD as collateral, and/or the installment note, and/or the unrecorded mortgage, Respondent [Miller] prepared an instrument giving him a substantial gift from a client in violation of RPC 1.8(c) and subjects Respondent to discipline under RLD 1.1(i).

Count II
... By obtaining an ownership interest in Ms. Ottomeier's CD, and/or preparing the installment note, and/or failing to record the mortgage, and/or cashing Ms. Ottomeier's CD and putting the proceeds of *1074 the CD to personal use, and/or obtaining the loan from the Cheney Federal Credit Union and/or allowing Ms. Ottomeier to forgive the loan made to Respondent, Respondent knowingly acquired an ownership, possessory security or other pecuniary interest adverse to Ms. Ottomeier on terms that were not fair and reasonable to Ms. Ottomeier and/or without giving Ms. Ottomeier a reasonable opportunity to seek the advice of independent counsel in violation of RPC 1.8(a) and subjects Respondent to discipline under RLD 1.1(i).

Count III
... By filling out the loan application for the Cheney Federal Credit Union, Respondent engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of RPC 8.4(c) and subjects Respondent to discipline under RLD 1.1(i).[16]
A four-day hearing was conducted on May 15-18, 2000. The hearing officer filed findings of fact and conclusions of law on September 8, 2000, in which he found that the WSBA proved the counts by a clear preponderance of the evidence. The hearing officer recommended the presumptive sanction of disbarment.
The Board considered this matter on automatic review under Rules for Lawyer's Discipline (RLD)[17] 6.1(a) and 6.2, and oral argument was held on March 25, 2001. On June 14, 2002, the Board entered its order, which affirmed the hearing officer's findings and conclusions and agreed that the presumptive sanction under the American Bar Association's Standards for Imposing Lawyer Sanctions[18] (Standards) was disbarment. However, a five-member majority of the Board found that mitigating factors and proportionality review made suspension, rather than disbarment, the appropriate sanction. The mitigating factors included the fact that Miller sent Ottomeier to meet with independent attorneys to review and witness the execution of her will and codicil. Also, it was evident to the majority of the Board that Ottomeier indeed wanted to leave a gift for Miller in her will.
The WSBA filed a petition for review with this court arguing that disbarment, rather than suspension, is proper. We granted review on this issue[19] on October 10, 2002.

II

Standard of Review
This court is the ultimate authority for Washington bar discipline matters. In re Disciplinary Proceedings Against Hankin, 116 Wash.2d 293, 295, 804 P.2d 30 (1991). When considering an attorney discipline charge, we do not disturb a hearing officer's findings of fact if they are supported by a clear preponderance of the evidence. In re Disciplinary Proceeding Against McMullen, 127 Wash.2d 150, 161-62, 896 P.2d 1281 (1995). In this case, the hearing officer's findings of fact and conclusions of law were unanimously affirmed by the Board. Therefore, we accept them as verities and will not disturb them for they were supported by a clear preponderance of the evidence. See In re Disciplinary Proceeding Against Carmick, 146 Wash.2d 582, 594, 48 P.3d 311 (2002). Further, we will not substitute our evaluation of the credibility of witnesses over that of a hearing officer's. Id. However, the *1075 conclusions found by the Board regarding the proper sanction are given greater weight than those of a hearing officer. McMullen, 127 Wash.2d at 162, 896 P.2d 1281. We are not bound by the Board's sanction recommendation, particularly when, as here, it is not unanimous. See In re Disciplinary Proceeding Against McLendon, 120 Wash.2d 761, 769, 845 P.2d 1006 (1993).

III
A violation of an attorney's oath, duties or the RPC is grounds for attorney discipline. RLD 1.1(c) and (i). Once a violation is found, the Standards require a two-step process to determine the appropriate sanction. First a presumptive sanction is determined by considering (1) the ethical duty violated, (2) the mental state of the attorney, and (3) the extent of the actual or potential harm caused by the attorney's misconduct. STANDARDS std. 3.0; see also In re Disciplinary Proceeding Against Johnson, 118 Wash.2d 693, 701, 826 P.2d 186 (1992). Finally, any aggravating or mitigating factors are taken into consideration which may alter the presumptive sanction. Id. In a case where an attorney has committed several acts of misconduct, the "`ultimate sanction imposed should at least be consistent with the sanction for the most serious instance of misconduct among a number of violations.'" In re Disciplinary Proceeding Against Peterson, 120 Wash.2d 833, 854, 846 P.2d 1330 (1993) (quoting STANDARDS at 6). We will adopt the Board's recommended sanction unless we are clearly persuaded that the sanction was inappropriate. In addition to the Standards, we also look to the factors of proportionality (sanction must not depart significantly from sanctions imposed in similar cases) and unanimity (sanction supported by unanimous recommendation will not be rejected in the absence of clear reasons) in deciding whether a sanction is proper. In re Disciplinary Proceeding Against Kuvara, Bar No. 03603-9, slip op. at 24, 149 Wash.2d 237, 259, 66 P.3d 1057 (2003).[20]

Ethical Duties Violated
Miller's multiple instances of misconduct involve issues of conflict of interest, which are governed by RPC 1.8(a) and RPC 1.8(c), and issues involving moral turpitude, which is addressed in RPC 8.4(c).

RPC 1.8(c)
RPC 1.8(c) prohibits an attorney from preparing an instrument which gives "the lawyer or a person related to the lawyer as parent, child, sibling, or spouse any substantial gift from a client, including a testamentary gift, except where the client is related to the donee." RPC 1.8(c) (emphasis added). Miller contends that he met the "letter and the spirit" of this rule since he made it clear to Ottomeier that he could not act as her attorney during the execution of her will, and since he had two other attorneys review and witness the execution of the will without him being present. Miller's Br. at 18-20. However, Miller's violation of RPC 1.8(c) occurred when Miller told his legal assistant what was to be included in the will (including the substantial gift to himself) and had the assistant draft the will accordingly. See Record of the Board (BR) at 21, Conclusions of Law (CL) 2. We hold that the clear preponderance of the evidence shows that Miller violated RPC 1.8(c).[21]

*1076 RPC 1.8(a)
RPC 1.8(a) prohibits an attorney from entering into a business transaction with a client, unless:
(1) The transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;
(2) The client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and
(3) The client consents thereto.
To justify a transaction between an attorney and his or her client, the attorney has the burden to prove: "`(1) there was no undue influence; (2) he or she gave the client exactly the same information or advice as would have been given by a disinterested attorney; and (3) the client would have received no greater benefit had he or she dealt with a stranger.'" McMullen, 127 Wash.2d at 164, 896 P.2d 1281 (quoting In re Disciplinary Proceeding Against McGlothlen, 99 Wash.2d 515, 525, 663 P.2d 1330 (1983)).
Miller clearly violated RPC 1.8(a) when he committed the actions set forth in Count II of the WSBA formal complaint. Miller contends that Ottomeier was a "sharp lady" and knew what she was doing when she consented to the business transaction with him. He also alleges that Ottomeier was fully briefed on the loan transaction because she had received advice from a bank representative regarding the loan. Further, he argues that he did in fact recommend to Ottomeier that she seek independent counsel, but Ottomeier refused to do so. However, there is no evidence in the record before us that this in fact happened. Even though Ottomeier was an intelligent woman who may have been aware of her financial matters, Miller is not excused from failing to properly comply with RPC 1.8(a). We cannot easily ignore that the hearing officer found that the clear preponderance of the evidence proved Miller violated the RPC. Because the hearing officer's findings of facts were adopted by a majority of the Board, we will accept them as verities. Carmick, 146 Wash.2d at 594, 48 P.3d 311. Further, one particular conclusion of law is telling:
Mr. Miller's ownership interest in the CD became adverse to Mamie's interests almost immediately thereafter, when Mr. Miller used his interest in the CD to obtain a personal line of credit ... Mr. Miller did not "fully disclose and transmit in writing" to Mamie the terms of the transaction, nor did Mr. Miller demonstrate that Mamie was "given a reasonable opportunity to seek the advice of independent counsel in the transaction."
BR at 22, CL 4(a). There is no evidence in the record to the contrary, and, therefore, we will not overturn this established conclusion of law. We find that Miller violated RPC 1.8(a).

RPC 8.4(c)
RPC 8.4(c) states that it is professional misconduct for an attorney to "[e]ngage in conduct involving dishonesty, fraud, deceit or misrepresentation." Miller does not dispute that he violated this rule when he falsely completed a sworn loan application for Cheney Federal Credit Union. See Miller's Br. at 14. However, he attempts to mitigate this violation by asserting that the loans from both the Credit Union and Ottomeier were repaid. Id. It makes no difference whether or not the loans were repaid. The violation occurred when Miller signed a document he knew to be false, which was in violation of 18 U.S.C. § 1014. As found by the hearing officer and unanimously affirmed by the Board, Miller was in clear violation of RPC 8.4(c). See BR at 23, CL 5 & 6.

Mental State: Knowledge and Intent
In determining the proper sanction, we must next consider Miller's mental state. "The lawyer's mental state may be one of *1077 intent, knowledge, or negligence." STANDARDS std. 3.0, cmt. at 25. When preparing the wills and loan transactions, Miller acted knowing that his interests were adverse to those of Ottomeier and with the intent to benefit himself. An attorney acts with knowledge when the attorney has the "conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." STANDARDS at 17. An attorney acts with intent when the attorney has "the conscious objective or purpose to accomplish a particular result." Id. With the above definitions providing guidelines, it is clear that Miller acted with the requisite knowledge and intent. For example, in regard to the preparation of Ottomeier's wills, the hearing officer found and the Board affirmed that "Miller had succeeded in making himself residuary beneficiary and eliminating all of the specific bequests that would have diminished his gift under the will." BR at 21, CL 2. In regard to the loans, the hearing officer concluded that Miller "never intended to actually repay the `borrowed' money from Mamie; rather, these transactions were structured deceptively to create the false appearance of a legitimate transaction." BR at 18, Findings of Fact (FOF) 50. Therefore, Miller's misconduct amounted to more than mere negligence. He acted knowing his actions would harm Ottomeier, and with the intent to benefit himself.

Harm
The next consideration is the extent of the actual or potential harm caused by Miller's misconduct. The Standards define injury as "harm to a client, the public, the legal system, or the profession which results from a lawyer's misconduct." STANDARDS at 17. Miller's actions created great harm to Ottomeier and her estate. When Miller converted almost $190,000 of Ottomeier's funds to himself via the loan, Ottomeier's estate lost a substantial amount of money. To this day, Ottomeier's true testamentary wishes are unknown. As exemplified in her meeting with attorneys Goss and Sampson when she executed her will, Ottomeier made statements which demonstrated her lack of certainty and confusion about what Miller was actually receiving from her will. See supra note 3. Ottomeier's heirs were also harmed by Miller's actions. Because of his misconduct, the heirs were forced to expend a substantial amount of money to unravel Miller's fraudulent actions. Miller has yet to repay Ottomeier's estate as ordered by the superior court since he discharged the amount when he filed for bankruptcy. Thus, Ottomeier's heirs received substantially less than they otherwise would have, and are clearly harmed by Miller's misconduct.

Presumptive Sanction: Disbarment
In determining the proper sanction in attorney discipline cases, we look to the Standards. See In re Disciplinary Proceeding Against Rentel, 107 Wash.2d 276, 282-83, 729 P.2d 615 (1986); In re Disciplinary Proceeding Against Johnson, 114 Wash.2d 737, 745, 790 P.2d 1227 (1990). Standard 4.31 discusses the propriety of disbarment when an attorney fails to avoid a conflict of interest:
Disbarment is generally appropriate when a lawyer, without the informed consent of client(s):
(a) engages in representation of a client knowing that the lawyer's interests are adverse to the client's with the intent to benefit the lawyer or another, and causes serious or potentially serious injury to the client.
Both the hearing officer and the Board found that Miller violated RPC 1.8(a) and RPC 1.8(c) multiple times. Each of the violations warrants disbarment pursuant to Standard 4.31. Furthermore, we have held that when an attorney uses client's funds for his or her own personal use, disbarment is the usual result. See In re Disciplinary Proceeding Against Allper, 94 Wash.2d 456, 463, 617 P.2d 982 (1980); In re Disciplinary Proceeding Against Kumbera, 91 Wash.2d 401, 403, 588 P.2d 1167 (1979).
In looking at Miller's violation of RPC 8.4(c), which he has conceded to, Standard 5.11 proffers that disbarment is also the presumptive sanction when:
(a) a lawyer engages in serious criminal conduct, a necessary element of which includes intentional interference with *1078 the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft; ... or
(b) a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice.
Miller's submission of a signed loan application to Cheney Federal Credit Union knowing it contained false information satisfies the elements of Standard 5.11. Miller executed the loan application with a signed certification subject to punishment under 18 U.S.C. § 1014, which makes it a federal crime, punishable by up to 30 years imprisonment, to knowingly make false statements in a document such as a loan application to a federally chartered and insured credit union. See 18 U.S.C. § 1014. Further, Miller's failure to disclose Ottomeier's unrecorded mortgage on the Ridgeview property allowed him to obtain a loan through fraudulent means.[22]

Aggravating and Mitigating Factors
When imposing a sanction for attorney misconduct, it is appropriate to look at aggravating and mitigating factors to determine whether the presumptive sanction should be altered. STANDARDS std. 3.0. The hearing officer in Miller's case found that the following aggravating factors[23] existed: (1) dishonest or selfish motive; (2) a pattern of misconduct; (3) multiple offenses; (4) refusal to acknowledge wrongful nature of some of the conduct; (5) vulnerability of victim; (6) substantial experience in the practice of law; and (7) indifference to making restitution. BR at 24. Specifically, the hearing officer found that Miller is "not genuinely remorseful about his misconduct ... [h]e still believes he did nothing wrong concerning the wills and CD loan transactions." Id. Previously, we have found that lack of remorse is a powerful aggravating factor. In re Disciplinary Proceeding Against Dann, 136 Wash.2d 67, 81, 960 P.2d 416 (1998). Because the aggravating factors are numerous and severe, we believe that the presumptive sanction of disbarment is clearly supported.
The mitigating factors[24] the hearing officer found in Miller's case are: (1) the absence of prior disciplinary record; (2) cooperative attitude towards the disciplinary proceedings; and (3) character or reputation (before the misconduct came to light). BR at 24. In addition, the Board found that a major mitigating factor was Miller's sending Ottomeier to see attorneys Goss and Sampson to review and witness the execution of her wills as required by the RPC. Decision Papers (DP) at 125. However, we find that adhering to the RPC is not a mitigating factor. Attorneys are expected to follow the rules. Therefore, following rules should not be considered a mitigating factor in attorney discipline cases. Even so, as the record demonstrates, it was Miller who drafted the wills and codicilnot the two independent attorneys. See BR at 8, 13 & 14, FOF 20, 31 & 35. In short, we do not find that the mitigating factors are so persuasive that the *1079 presumptive sanction of disbarment should be altered.

Modified Noble Factors
Once our analysis under the Standards is satisfied, the presumptive sanction may further be altered by considerations of proportionality and unanimity. See Kuvara, slip op. at 24, 149 Wash. 2d at 259, 66 P.3d 1057. Under the unanimity factor, we look to see the extent of agreement among members of the Board. Id. "`We will hesitate to reject a unanimous recommendation in the absence of clear reasons for doing so.'" Id. (quoting In re Disciplinary Proceeding Against Noble, 100 Wash.2d 88, 96, 667 P.2d 608 (1983)). Here, the Board was divided, with five members voting for suspension, three members voting for disbarment, and one member voting for a reprimand. Because there was not a high degree of unanimity among the nine Board members, we are less constrained by the majority's conclusion.
Under proportionality review, we analyze whether a presumptive sanction is proper by comparing the case at hand with other similarly situated cases in which the same sanction was approved or disapproved. See Noble, 100 Wash.2d at 95, 667 P.2d 608. The sanction must not depart significantly from sanctions imposed in similar cases. Id. For Miller's case, the Board compared it with McMullen, 127 Wash.2d 150, 896 P.2d 1281.
The majority of the Board found that McMullen was factually similar to Miller's case. McMullen assisted his client, an elderly woman, in breaking a trust so that she could utilize the proceeds. McMullen, 127 Wash.2d at 153, 896 P.2d 1281. McMullen received permission from the client's children and the trustee to break the trust based on his statements that he "would create an informal trust, placing the money in an account which required both his and [the client's] signatures." Id. Such an action would protect the client from McMullen absconding with funds without the client's permission, and also protect the client from reckless spending by requiring McMullen's advice and consent. Id. at 153-54, 896 P.2d 1281. Within several weeks of the release of the trust proceeds, McMullen arranged to borrow approximately half of the proceeds amount. Id. at 155, 896 P.2d 1281. Although the client signed an affidavit indicating that she realized the potential problems the loan created and that she was given the opportunity to discuss the transaction with independent counsel, the hearing officer found that "[t]o borrow `from an 84 year old woman with no financial sophistication whatsoever under the circumstances of this case was dishonorable of its very nature.'" Id. at 160, 896 P.2d 1281 (quoting Bar File doc. 14, at 15). The Board recommended disbarment for McMullen, but this court reduced the sanction to a one-year suspension due to mitigating circumstances. The Board in the case at hand found that although Miller acted dishonestly regarding the loan application, McMullen warranted a sanction short of disbarment, and recommended an 18-month suspension. DP at 125.
We find that Miller has failed to prove that disbarment would be disproportionate to his numerous violations. In comparing Miller's case with McMullen, we come to a different conclusion than that of Miller and the majority of the Boarddisbarment. Attorney McMullen's misconduct was less pervasive than that of Miller. Miller's violations were more numerous and more systemic than McMullen's. McMullen, unlike Miller, reaffirmed his debt to his client when he declared bankruptcy. McMullen, 127 Wash.2d at 158-59, 896 P.2d 1281. Also, this court found that McMullen actually complied with some of the RPC requirements by disclosing terms in writing, advising the client to seek independent counsel, and obtaining the client's written consent. Id. at 164-65, 896 P.2d 1281. Miller, on the other hand, did not comply with the RPC in any manner. See generally BR at 2-28. Further, it cannot be ignored that Miller falsified loan documents, which is a violation of 18 U.S.C. 1014. Therefore, Miller's actions clearly warrant a sanction of disbarment.
We also look to In re Disciplinary Proceeding Against Gillingham, 126 Wash.2d 454, 896 P.2d 656 (1995) as a benchmark for Miller's disbarment. Attorney Gillingham *1080 received a 60-day suspension for violations of RPC 1.8(a) and 1.8(c). Gillingham's violation occurred when he accepted a loan from a clienta loan that was instigated by the client and on the client's terms. Id. at 458, 896 P.2d 656. We found that Gillingham violated RPC 1.8(a) because he failed to fully disclose the terms in writing to the client. Id. at 462-63, 896 P.2d 656. Gillingham also violated RPC 1.8(c) because he made changes to his client's will while he was a named beneficiary. Id. at 466, 896 P.2d 656. Although the client eventually removed Gillingham from the will, we found that Gillingham knowingly violated RPC 1.8(c) since potential harm existed. Id. The Gillingham court stated:
As for the extent of harm, no actual harm resulted since Gillingham received no portion of the estate. However, the potential harm was extreme. What Gillingham did is banned for good reason. The RPC prohibits lawyers from drafting wills in which they receive substantial gifts because the practice is inherently permeated with the dangers of self-dealing and undue influence.

Id. at 466-67, 896 P.2d 656 (emphasis added). As discussed in the Board's dissent order, Miller's conduct was more egregious than that of Gillingham. DP at 127. Miller did not repay the loan from Ottomeier. Instead, he claimed that Ottomeier forgave him on the loan. Id. In addition, Miller was ordered to repay the loan to Ottomeier, which he subsequently discharged in bankruptcy. BR at 20, FOF 56. Also, the terms for the Gillingham loan were reasonable for the client, whereas Miller's loan from Ottomeier would not have been paid off until Ottomeier reached the age of 115 and the interest rate was less than that being offered at the bank. We characterized the potential harm in Gillingham as "extreme." Gillingham, 126 Wash.2d at 466, 896 P.2d 656. Because Miller caused actual harm to Ottomeier, proportionality analysis shows that disbarment is the appropriate sanction.

IV
As found by the hearing officer and affirmed by the Board, Miller clearly violated RPC 1.8(a), 1.8(c) and 8.4(c). Under the Standards, the presumptive sanction for these violations is disbarment. Because there are numerous aggravating factors and few mitigating ones, we feel it is not appropriate to deviate from this presumptive sanction. Furthermore, proportionality analysis clearly supports disbarment in this case.
Therefore, we vacate the Board's recommendation of an 18-month suspension and order Miller's disbarment.
ALEXANDER, C.J., and JOHNSON, MADSEN, IRELAND, CHAMBERS, OWENS and FAIRHURST, JJ., concur.
NOTES
[1] Five board members recommended an 18-month suspension, three members affirmed the hearing officer and recommended disbarment, and one member recommended a reprimand.
[2] Record of the Board (BR) at 3, Findings of Fact (FOF) 1.
[3] When Ottomeier was asked if it was her intent to leave Miller the residual of her estate, she answered, "It's a little bit different than what I had thought of. I had thought that Mr. Miller would just get a certain amount and the rest of it would be divided in the estate." BR Ex. 8, at 8 (transcript of Ottomeier's meeting with attorneys Goss and Sampson).

When Ottomeier was asked if it was her intent to leave Miller an inheritance the size of approximately $400,000 to $500,000, she answered, "Well no, I just thought that he would put down maybe ... oh, a $100,000.00 or something like that. And the rest of it would all be in the estate. But I don't know, he never did talk to me about it." BR Ex. 8, at 8.
[4] The other witness to the will was Cynthia Zabel, who was an employee of a bank and knew Ottomeier in that capacity. Zabel was also a friend of Miller.
[5] A legal intern from Sampson's office was the other witness. Miller's secretary was also present to notarize the signatures.
[6] BR at 15, FOF 40.
[7] BR at 17-18, FOF 50.
[8] See BR Ex. 33; BR at 20, FOF 57.
[9] See BR Ex. 35; BR at 20, FOF 57.
[10] BR Ex. 56 at 2; BR at 19, FOF 53.
[11] BR Ex. 1 at 12; BR at 19, FOF 54.
[12] BR Ex. 1, at 13; BR at 19, FOF 54.
[13] Lawson v. Miller, No. 15268-5-III, 85 Wash. App. 1058, 1997 WL 162378 (Wn. Ct.App. April 8, 1997).
[14] BR at 20, FOF 56.
[15] Id.
[16] BR at 1988 (WSBA Formal Complaint).
[17] It is noted that the RLD were superseded by the Rules for Enforcement of Lawyer Conduct (ELC) effective October 1, 2002. Because the RLD were still in effect at the time of Miller's misconduct, this case will be evaluated under the RLD rather than the ELC.
[18] (1991 ed. & Supp.1992).
[19] In Miller's brief, he set forth 13 assignments of error relating to the hearing officer's findings of fact and conclusions of law. However, Miller's arguments are procedurally barred by the RLD and the Rules of Appellate Procedure (RAP). Under RLD 7.2, Miller was entitled to an appeal of right of the Board's decision. However, Miller failed to file a notice of appeal within 15 days of the Board's decision. See RLD 7.2(b). Pursuant to RLD 7.3(d), which relates to the content of the petition, answer, service and decision of attorney disciplinary matters, the provisions of RAP 13.4(d), (e), (f), (g) and (h) shall govern. Thus, pursuant to RAP 13.4(d), if Miller wanted to raise issues that were not raised in the petition for review, he should have done so in his answer, which he did not. Therefore, the assignments of error raised in his brief will not be entertained by this court.
[20] Previously, it was the practice of this court to adopt the recommendation of the Board unless the court was clearly persuaded by one or more of the following Noble factors that the Board's recommended sanction was inappropriate: (1) the purpose of attorney discipline; (2) proportionality of the sanction to the misconduct; (3) the effect of the sanction on the attorney; (4) the record developed by the hearing panel; and (5) unanimity of the board. In re Disciplinary Proceeding Against Noble, 100 Wash.2d 88, 95-96, 667 P.2d 608 (1983). These factors were modified in Kuvara. See generally Kuvara, slip. op. at 20-24, 149 Wash.2d at 256-59, 66 P.3d 1057. We retained the factors of proportionality and degree of unanimity, but discarded the remaining factors due to the existence of similar provisions in the Standards and ELC. Id. at 259, 66 P.3d 1057.
[21] At oral argument before this court, Miller's counsel, Clinton Henderson, suggested that Miller's actions regarding the drafting of Ottomeier's wills constituted only negligence. Henderson argued that if Miller had handed over Ottomeier's will to attorneys Goss and Sampson to copy onto their letterhead or had attorneys Goss and Sampson redraft the will, Miller would not be in violation of RPC 1.8(c). Henderson clearly misinterprets the law. To avoid violation of RPC 1.8(c), Miller should have sent Ottomeier directly to independent counsel, had Ottomeier tell that attorney what she wanted in her will, and had that attorney draft it. The RPC is clear and unambiguous. Miller cannot avoid violation of this rule by having attorneys Goss and Sampson copy the will that he drafted onto their own letterhead.
[22] The testimony of Joanne Sanders, an officer of Cheney Federal Credit Union, confirmed that Miller would not have obtained the loan from Cheney Federal Credit Union if he had not omitted Ottomeier's unrecorded mortgage from his loan application. See Tr. at 473:16 to 474:5; 484:3 to 484:15.
[23] Under the Standards, aggravating factors include: (a) prior disciplinary offenses; (b) dishonest or selfish motive; (c) a pattern of misconduct; (d) multiple offenses; (e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with the rules or orders of the disciplinary agency; (f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process; (g) refusal to acknowledge wrongful nature of conduct; (h) vulnerability of victim; (i) substantial experience in the practice of law; and (j) indifference to making restitution. STANDARDS std. 9.22 (1991).
[24] Under the Standards, mitigating factors include: (a) absence of prior disciplinary record; (b) absence of selfish or dishonest motive; (c) personal or emotional problems; (d) timely good faith effort to make restitution or to rectify consequences of misconduct; (e) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (f) inexperience in the practice of law; (g) character or reputation; (h) physical disability; (i) mental disability or chemical dependency including alcoholism or drug abuse; (j) delay in disciplinary proceedings; (k) interim rehabilitation; (l) imposition of other penalties or sanctions; (m) remorse; (n) remoteness of prior offense. STANDARDS std. 9.32 (1991 ed. & Supp.1992).